### McNABB v. McNABB.   (No. 2047.)

(Court of Civil Appeals of Texas. Amarillo. March 14, 1923. Rehearing Denied April 4, 1923.)

**Divorce ⊸130—Evidence of defendant's mental condition as affecting responsibility for misconduct held to warrant decree for husband.**

Evidence of a wife's misconduct resulting in constant turmoil and trouble between the parties, presenting a question as to whether she was responsible for her acts, or whether because of her mental condition she was irresponsible *held* not to warrant setting aside a verdict of the jury in favor of the husband.

Hall, C. J., dissenting.

Appeal from District Court, Oldham County; Reese Tatum, Judge.

Action for divorce by C. M. McNabb against Ivey E. McNabb. Judgment for plaintiff, and defendant appeals. Affirmed.

Veale & Lumpkin, of Amarillo, and Culton & Taylor, of Tulia, for appellant.

Underwood & Jackson, Adkins & Kimbrough, and Chas. H. Keffer, all of Amarillo, for appellee.

BOYCE, J. On original statement this case fell to the lot of the Chief Justice. The other members of the court being unable to agree to the conclusions reached by him, the

task of stating the conclusions of the majority has been assigned to the writer.

This is a divorce case and this is the second appeal therein. See 207 S. W. 129. The case was tried at the last trial on the same pleadings, and the facts are largely the same as on the former appeal. We refer to the opinion on such appeal for a general statement of the case and of the law which is to govern its decision.

On the last trial the case was again submitted to the jury on a general charge, and the verdict and judgment was again for the plaintiff. We are agreed that the charge of the court on the last trial was a fair presentation of the law of the case; our disagreement being as to the sufficiency of the evidence to sustain the verdict of the jury. There was no evidence of physical violence and our disagreement is as to: (1) Whether the acts charged as grounds for divorce show a studied and deliberate purpose on the part of the defendant to injure the plaintiff; (2) whether the physical and mental condition of the defendant was such as to render her irresponsible for her acts; (3) whether these acts were of such nature as to render the further living together of the plaintiff and defendant insupportable.

The plaintiff and defendant lived together as man and wife for less than a year. The evidence warrants the conclusion that this period was one of almost constant domestic turmoil and infelicity; that defendant neglected her household duties, leaving these to be performed largely by the plaintiff, who was a farmer, and his children by his former wife; that defendant neglected these small children and was at times very ill-tempered, harsh, and violent in her treatment of them; for instance, on one occasion she seized a folding hat rack and broke it over the head of plaintiff's six year old son; she nicknamed plaintiff's daughter, Ruth, eight years old, "Lazy Lize." Many of the acts of misconduct referred to in the record were in their inception exhibitions of uncontrolled temper and petulence, resulting from some real or fancied provocation or slight, and, if these had been the end of her misconduct, would have afforded no grounds for divorce; but it appears that on many such occasions defendant would go to bed and remain there frequently for several days at a time, and on one occasion for two weeks. We refer to one such instance: Plaintiff's father, mother, and sister were visiting at his home. Defendant, without just cause, became angered with the plaintiff, treated him and his relatives with marked discourtesy, went to bed, and stayed there until his relatives brought their visit to an end. At times she would refuse to take food and on one occasion went on a "hunger strike," declaring that she was going to starve herself to death. On another occasion she bought poison, and, according to the testimony of the attendant physician, simulated symptoms to indicate an attempt at suicide. The evidence warrants the conclusions that plaintiff was patient and forbearing with the defendant until toward the end of their married life and until he made up his mind and informed her that he intended to separate from her. Thereafter on occasions he did not treat her with much sympathy or consideration. The jury probably found that his patience had been exhausted and excused him for these acts. These repeated spells of sulking in bed on the slightest irritation sufficiently indicated a deliberate purpose on the part of the defendant to injure the plaintiff. If the defendant was responsible for her acts, we think the jury were warranted in finding that they constituted the "excesses, cruel treatment or outrages" mentioned in the statute.

As to the defendant's responsibility the evidence tends to show that from childhood defendant had been subject to periodic spells of nervousness and ill temper. Dr. Allison, who treated her in his sanitarium for nervous and mental diseases, testified that she had pellagra; was mentally sick; "could not control herself and was not responsible for her acts." Dr. Vineyard, who saw defendant once in consultation, shortly before she went to Allison's sanitarium, testified that she did not have pellagra. He said:

"I considered her to be only a neurasthenic, and that her trouble was entirely domestic, she being a neurasthenic."

Dr. Collins, who attended her on several occasions and saw her just before she went to Allison's sanitarium, testified that the defendant had no symptoms of pellagra; that the term "neurasthenic"—

"is loosely employed to represent almost any condition from the slightest nervous irritation clear down to insanity and the term would mean little within itself. I found nothing in Mrs. McNabb that would authorize me to say from my examination that she was a neurasthenic in any degree, but she was somewhat nervous, and I would call it nervous excitement or nervousness, and not true neurasthenia. * * * She was a shamming neurasthenic. * * * I did not find any evidence of insanity or dementia."

The question of responsibility was submitted to the jury, and the verdict indicates that they found that plaintiff was responsible for her acts. There is a presumption of responsibility, and, while the evidence would sustain a finding that defendant was not at times responsible for her acts, we are not prepared to say that the evidence is so conclusive as to warrant us in setting aside the verdict of the jury on this ground.

Plaintiff testified that defendant's conduct

was rendering his life and that of his children miserable and was breaking up his family; that one of the boys, 14 years old, was threatening to leave home; that he was very much worried by these conditions, was losing sleep, and his mental and physical condition generally impaired. We think the evidence supports the finding that the further living together of the plaintiff and defendant had been rendered insupportable by the acts of the defendant.

Two juries have, on hearing the facts, decided the issues in plaintiff's favor. The trial court has on each occasion approved the finding. We do not think that we should set aside this last verdict and judgment rendered on a fair submission of the law of the case.

The judgment is therefore affirmed.

HALL, C. J. I respectfully dissent from the majority in affirming the judgment below. The case was tried the last time without an amendment by either party of their pleadings. The evidence introduced by the appellee to sustain the allegations upon which he bases his action for divorce were in no degree strengthened upon the second trial. In the former opinion Huff, C. J., says:

"The rule in this state, as well as in others, is that parties cannot be divorced for incompatibility, or because they live unhappily together, or merely because they possess unruly tempers, or for marital wranglings. If the acts of appellant were only from sudden outbursts of temper, the acts complained of would not have authorized a divorce; or if any such acts were the result of sudden temper, and not intended to injure the appellee, the jury should have been told to disregard them. The acts in this case were not within themselves cruel. They were only so if they were willful, and for the studied purpose of inflicting injury upon the appellee. The acts must have arisen from a motive to cause suffering to the appellee."

The rule as stated by Huff, C. J., is sustained by reason and the great weight of authority. Where the conduct complained of as being cruel is not accompanied with violence or threats of personal injury, even though it may result in mental pain or distress, the courts, with practical unanimity, hold that, before it can be considered as a basis for dissolving the marriage, it must appear that such conduct was studied, willful, and deliberate. 19 C. J. 46, § 83; Sheffield v. Sheffield, 3 Tex. 79; Sharman v. Sharman, 18 Tex. 521; Dawson v. Dawson, 63 Tex. Civ. App. 168, 132 S. W. 379. The case was reversed before because this and other material issues were not submitted to the jury. Upon the former trial the appellant seems to have defended upon the theory that violence or threats to inflict personal injury were necessary to constitute cruelty. This theory was not sustained in the former opinion. Upon the last trial there was considerable

additional evidence introduced bearing upon the issue of willfulness and showing that the acts complained of were not deliberate, but were the result of the appellant's physical and mental condition, and I think this evidence is conclusive against an affirmance of the judgment. Notwithstanding this testimony, the effect of the general verdict is that the conduct charged by appellee was for the studied purpose of inflicting suffering upon him, and the decree against her implies not only that her conduct was cruel, but that it is of such a nature as to render their living together insupportable to the appellee. The action is based upon the first subdivision of article 4631, V. S. C. S., providing that a divorce may be decreed:

"1. Where either the husband or wife is guilty of excesses, cruel treatment or outrages toward the other, if such ill treatment is of such a nature as to render their living together insupportable."

The appellant vigorously attacks the verdict and judgment because the evidence does not show that the conduct of appellant amounted to such cruelty as to render their living together insupportable, and further because, it appearing from the entire record that the conduct complained of was involuntary and the result of appellant's neurotic condition, the necessary element of willfulness is wanting, and that the judgment should be set aside. I think this contention should be sustained. As said by Huff, C. J., in the former opinion, quoting from Byrne v. Byrne, 3 Tex. 336:

"It is not sufficient that a jury has found that outrages have been committed of such a nature as to render their living together insupportable. What is meant in our statute by 'insupportable' and 'outrages' is a question of law. The existence and truth of the facts that amount to such outrages are for the jury to find."

As a matter of law these facts do not bring the case within the terms of the statute. Appellee, McNabb, testified upon this trial:

"I married her because I respected her, and told her that I did not love her like I did my other wife, and did not suppose I would ever love any woman like that, but thought it would be better for me, and I told her that I thought it would be a happier life to have a good woman as a companion, and she said she thought I would, too, and she said that she thought that she would be happy as my wife and would be glad to help me raise the children; that I respected her, and it was more of an agreement like that than it was a marriage for love. It was a marriage for convenience on her part as well as mine. I do not know that she told me that she loved me, and do not know just what she said about it, and she told me time and time again after we were married she did love me, and I never told her that I loved her."

It appears from the statement of facts that about 6 months after the parties were

married appellee sent appellant to a private insane asylum at Fort Worth, after he had repeatedly demanded that she file suit against him for divorce, and had offered to pay all expenses of the suit. His explanation of why he sent her to the insane asylum appears from the following testimony: '

"Q. Did you take your wife and put her in that insane asylum at Fort Worth for the purpose of getting rid of her? A. Well, that was— Q. Can you answer that 'Yes' or 'No'? A. Yes, sir. Q. Do you answer that you took her and put her in that insane asylum at Fort Worth for the purpose of getting rid of her? A. Yes, sir; I could not stand to live with her, and I could not get her to agree to a separation. I tried to get her to separate before and up to this time, I told her I would not live with her any more, and I could not get her to agree to a separation, and I talked to the doctors, and they advised in a way that was the only way I knew I could get shed of her."

As stated by Huff, C. J., in the former opinion, the appellee's own evidence tends to show that the appellee is not entirely free from censure, and that in several instances his conduct tended to provoke the fits of temper which he sets up as facts amounting to cruelty. I accept as true his statement that, in so far as he was concerned, the marriage was one purely of convenience; that he needed a housekeeper and some one to control his children. But the evidence does not support his statement that the appellant married him as a matter of convenience. He admits that she told him many times that she loved him. Her letters written from the insane asylum at Fort Worth where he had taken her, in the first step toward carrying out his design to rid himself of her, breathe a spirit of genuine affection; yet he replied to them by blunt commands to go to her people as soon as she was discharged from the asylum, and not to return to him and her home. The marriage relation is too sacred and too holy to be entered into as a mere matter of convenience and to be treated as an obligation which may be cast aside by either party when the other becomes, through insanity, ill health, or any other cause, an inconvenience. The maintenance of the purity and sanctity of the institution of wedlock is a matter in which the public is deeply interested. The home is the foundation of our form of government, and the boasted grandeur of our civilization and national progress, when traced to its source, must end in the family life. The welfare of society demands that the marriage relation shall not be entered into flippantly and as a mere matter of material convenience or animal considerations, and contemplates that such a union should be one of souls, and that the finer instincts and nobler impulses of the parties are involved. It is easy to understand how a man who has married as the result of genuine affection and impelled by the highest and holiest motives might have his life made miserable when the woman upon whom he has concentrated his all proves to be a disappointment. It is equally difficult to understand how a man who has married for convenience could have his finer feelings, if any, outraged to the extent that his life is insupportable merely because the woman he has taken as a convenience proves to be an inconvenience and a liability. Whatever motives may prompt either or both of the parties to marry, when the union is once formed, the law steps in and holds them to the performance of various obligations, duties, self-denials, and mutual considerations, and, in protecting the higher interests of society, does not permit the bond to be severed as a mere matter of convenience to one or both parties. McNabb's testimony as to the effect upon him of appellant's conduct after she returned from Fort Worth appears in the statement of facts as follows:

"I knew that her life was not pleasant, and neither was mine, and we could not get any pleasure out of life that way and ruining the lives of the children, and I told her that it was ruining my life, that I was very miserable, and tried to get her to agree to any kind of a separation, and told her that I would go to a hotel and make arrangements for her or at any place she wanted to go and would pay her anything that she thought was right, and she would not agree to anything. The effect of these incidents and treatments and statements had on my health and nervous conditions was a very deep effect; it hurt me awful bad and made me nervous, restless, and contentious. Up until this time I had been a very sound sleeper, and this would worry me and make me wakeful, and would wake up at night and lay awake sometimes for half of the night, and this was frequent, and it made me more nervous, but I cannot state to what extent, and I think that my appetite was not very regular, sometimes I would eat heartily, and sometimes I would not, but it was not as good as it had been, and I think it had an effect on my mental ability, but I cannot state to what extent. I had not been troubled that way before. I do not know whether there was any change in my weight or not."

The record is barren of any testimony from the appellee showing the effect upon his mental or physical condition prior to the time he took appellant to the asylum, unless it be the fact that he had concluded that she was more of a handicap than a convenience. The appellee not only wrote appellant several letters, while she was in bed in the asylum in Fort Worth under the care of a specialist, to go to her own people, and not to return to his home, after her discharge from that institution, but states that he also wrote Dr. Allison, the physician in charge of the asylum, to tell her to go home to her people, and not to return to her home. She refers

to this message as being cruel in a letter she wrote while in bed at the asylum, but does not upbraid him for it, and begs for the privilege of coming back to him and being given another trial and allowed the privilege of talking the situation over face to face. He testified that prior to the time they were married appellant told him that she had two natures—one pleasant; the other disagreeable. The record is replete with evidence tending to show that appellant was, and had been from early womanhood, neurasthenic. She had been operated upon for functional female troubles, and had suffered since girlhood with recurring attacks of nervousness. When appellee carried her to the asylum he gave the chief physician, Dr. Allison, a history of her condition, telling him that she had been nervous for years; that her nervousness came in spells; that she had a fear of something going to happen to her; that she exhibited a very violent temper at times, causing domestic troubles; that she would become very cross and irritable and could not control herself, and would become fretted when he attempted to argue her out of the spells, and at times would be cross and irritable to the children; that he had been advised by his physician that she had a nervous disorder and needed treatment in a sanitarium. Dr. Allison testified that according to his diagnosis while she was in his asylum for 37 days appellant had psychasthenia; that she made some improvement while there under treatment; and that appellee wrote him that, if appellant only had a functional disease, he was through with her, and for Dr. Allison to tell her not to come back to him any more, but to return home to her own folks. Dr. Allison testified that, owing to her extreme nervousness, appellant could not control herself and was not responsible for her acts while in her extreme nervous condition; that she was mentally sick. He further stated that she had pellagra, and that nervous and mental troubles were the symptoms of that disease; that at the time she entered the asylum she had additional gastrointestinal symptoms and was weak and suffered with insomnia, accompanied by nausea and vomiting at times. The letters written by appellee to appellant and to her physician, in an effort to drive her from his home, were certainly not conducive to her improvement or recovery. At a time when she stood most in need of his sympathy and expressions of his affection he wrote her the cruelest message a husband could pen to his wife. He testified that she stated on one occasion that she wished he would kill her. The evidence shows that after she had been neglected she purchased a bottle of chloroform and attempted to take her life, though there is evidence that she really did not intend to commit suicide. The evidence further shows that when seized with one of her nervous

spells she would go to her room, go to bed, stay there for several days, and once she threatened to starve herself to death. Aside from the uncontradicted testimony of Dr. Allison, who, it appears, is an expert in nervous and mental diseases, these facts unquestionably show that her outbursts of temper and the conduct which rendered her an inconvenience were the result of incontrollable impulses, and are not such studied, willful, and deliberate treatment as the law contemplates shall be a ground for divorce. If it be admitted that the appellee's mental anguish is such as to render his living with appellant insupportable, nevertheless if his suffering is not caused by the deliberate and willful intent on the part of appellant, but is the result of her mental and nervous conditions, rendering her wholly or partially incapable of self-control, and that her irritability and extreme nervousness is caused by physical functional derangement peculiar to her sex, these facts call for a greater degree of patience and devotion on the part of the husband. Insanity, by express provision of the statutes of this state, as well as at common law, is not a ground for divorce. V. S. O. S. art. 4632, provides that the statutes entitling either party to a divorce "shall not apply to any case where either the husband or wife is insane." And it is held in Daugherty v. Daugherty (Tex. Civ. App.) 198 S. W. 985, that the statute is an absolute prohibition against the granting of divorce upon any ground whatever if either party is insane. While it is true appellant cannot be classed as a lunatic, as the term is understood, it does not lie in the mouth of appellee to insist that there is not mental derangement to a serious extent after having carried her to a private insane asylum to be treated for that very condition and after having written letters to her while she was there, the necessary effect of which would be to defeat the ostensible purpose which he had in carrying her there.

The evidence shows that on Thanksgiving Day, several weeks before he carried her to the asylum, he tried to hire her to institute a suit against him for divorce; that he had, prior to that time, tried to induce her to employ attorneys to file the suit. Failing in this, he went from his home in Vega to Amarillo and hired attorneys to institute this suit and to enjoin her from remaining in his home.

I fail to find in the entire record any evidence showing that the conduct complained of on the part of appellant was the result of willfulness, unless it be the evidence showing that during her attacks she would go to bed and remain for several days, and on one occasion as much as two weeks. Even if appellee's pleading can be construed as charging that her sullenness and her stubborness in remaining in bed and refusing food for sev-

eral days at a time amounted to cruelty to appellee, I think upon the whole record that it does not sustain the charge of willfulness. And, even if it be admitted that she was as disagreeable as appellee contends, she would evidence less willfulness by going to her room and to bed for several days than by actively participating in the affairs of the household while she was in that condition. It occurs to me that going to bed is the best thing a neurotic, neurasthenic, or psychasthenic wife can do—best for both parties.

Appellant was probably too sensitive and too easily irritated, but this fact, under all the circumstances, called for more tolerance and forbearance on the part of the appellee and for the exercise of more care in an effort to avoid giving offense. Wedlock in its truest sense is the union of two souls, pledged to strengthen each other in hours of weakness, to comfort each other in times of sorrow and to minister to each other during periods of suffering and gloom. There will be in such a union sympathy for mental or physical infirmities rather than impatience with, and criticism of, their effects. The question of convenience or inconvenience is a minor consideration which the law does not countenance.

There are no facts showing that by reason of appellee's temperament, character, or occupation he had experienced anything more than extreme annoyance by reason of the conditions which he alleges or that he would probably suffer in the future beyond the effect ordinarily resulting to any husband of a sick wife. McAlister v. McAlister, 71 Tex. 695, 10 S. W. 294. From his frequent efforts to induce her to sue him for a divorce we may reasonably infer that he thought she had some ground, and, if so, recrimination is shown.

The law looks with more indulgence upon the conduct of a sick wife toward her husband than when both parties are normal. Sapp v. Sapp, 71 Tex. 348, 9 S. W. 258. Subdivisions 2 and 3 of article 4631, V. S. C. S., show that the lawmaking body has been extremely partial to the husband in the matter of fixing the grounds of divorce, thus recognizing the fact that husbands are made of coarser material than their wives, and the courts seem to have noticed and impliedly assented to the difference recognized by the Legislature and have applied the rule:

"Unto whomsoever much is given of him shall be much required, and to whom men have committed much of him they will ask the more."

See McAlister v. McAlister, supra; Sapp v. Sapp, supra; Taylor v. Taylor, 18 Tex. 574; Bahn v. Bahn, 62 Tex. 518, 50 Am. Rep. 539; Jones v. Jones, 60 Tex. 451; Pinkard v. Pinkard, 14 Tex. 356, 65 Am. Dec. 129; Jones v. Jones (Tex. Civ. App.) 41 S. W. 413; Eastman v. Eastman, 75 Tex. 473, 12 S. W. 1107.

Even if it should be held that dementia, from whatever cause and in any degree, was a ground for divorce, and was not a defense to a suit brought for divorce upon any other ground, it has not been shown that appellant's malady is incurable. On the contrary, the undisputed evidence is that her condition improved materially while she was in the asylum in spite of appellee's disheartening letters summarily banishing her from his home and his life.

It must be admitted that the appellant was not a model housekeeper, but, considering the condition of her health, she could not be expected to assume and discharge with entire satisfaction such a burden for so large a family. Two local physicians testified that she manifested no symptoms of pellagra. One of these visited appellant occasionally, and the other only saw her one time. Over against this evidence, Dr. Allison, who treated her at the asylum daily for more than five weeks, testified that she had pellagra. Be this as it may, they all agree that hers was a serious case of nervous and mental disorder which required treatment by a specialist.

Appellee admits that all offenses were condoned from time to time until just before appellant was carried to Fort Worth. A repetition of her past conduct after her return to Vega would not, I think, because of her mental condition, revive past offenses.

The court found that $500 would be a reasonable allowance to appellant for attorney's fees, but refused to enter judgment for the amount because she was not entitled to recover. He admits condonation up until he carried her to the asylum. He impliedly admits recrimination by trying to get her to sue him for divorce, and aside from this I agree with Judge Huff's statement upon the former appeal that there is evidence of recrimination, and the evidence upon that issue comes from the appellee himself.

I think the judgment of the lower court should be reversed, and here rendered, denying the appellee a divorce and decreeing that appellant recover an attorney's fee of $500, and all costs.